May it please the Court, good morning, Your Honours. My name is Hung Ta from the law firm HGT Law. I'm here on behalf of the plaintiff appellant, Judith Burbrink. Your Honours, this appeal concerns an important proposition of corporate law and it is that when directors tell shareholders repeatedly, in proxy statements no less, filed annually, that they are performing various duties but then they ignore those duties. That amounts to a conscious disregard of responsibility and it amounts to an actionable breach of the duty of loyalty. This Court has held that in Rosenblum in the Lynch v. Rawls case. The Delaware Chancery Court has affirmed that principle, that very fundamental principle in Stone v. Ritter. And in this case, there can't be a more clear-cut situation where there was a conscious disregard of responsibility. It's easy to say, but let's work through the component parts of this. Let me ask you first of all, were the non-interested directors in this case entitled to rely on the Argus report? They were not, Your Honour. And why is that? Because if you look at the Washington Business Corporations Act, which provides for the justifiable reliance defense, the statute provides for two parts to the defense. The first part is that the directors are only entitled to rely on an expert who has competence in the area. The statute says the directors can only rely on experts as to matters the director reasonably believes are within the person's professional or expert competence. But, counsel, with respect, I thought Argus was the gold standard for this kind of thing. They're used across the country, are they not, for this very type of evaluation? Well, we never alleged that. I'm not sure. No, I know you didn't allege it. I get that. But what I'm saying is, is there anything you are aware of that would suggest that Argus is corrupt or is somehow under the sway of the non-interested directors? No, Your Honour, that's not our argument. Or not qualified. How are they not qualified? They're not qualified for this reason, Your Honour. As we alleged in the complaint, the directors every year told shareholders in the proxy statements that they perform various reviews. The first review that they performed was a review of to see whether there was a net benefit to the transactions. The second review that they performed was to see whether the transactions were reasonable and fair. A third review that they said they performed with respect specifically to the Nordstrom family transactions was that they ensured that the estimated costs to Nordstrom of providing these services to the Nordstrom family were exceeded by the payments received from the family. That's the very thing that Argus purportedly did. The first two items you mentioned were, of course, the duty of the board members. But I'm talking about Argus here, and in the case of Argus, I thought they were hired to determine what was the appropriate payment that the Nordstrom family members should pay to the company to cover their costs. Now, I know you disagree with it, but my understanding is, and correct me if I'm wrong, that when Argus proposed a figure and the Nordstrom family actually paid more than that. Did I miss something? Respectfully, Your Honor, that's an incorrect characterization. Okay. Tell me what happened. The proxy statement says very clearly that every year it says that the payments received from the Nordstrom family have two qualities. One, they were based on rates that they surveyed in the industry, and these were the rates that they charged the Nordstrom family. But then also the proxy statement said that the payments received exceeded the estimated cost. Now, Argus did the first part. Argus looked around and looked to see what other people were paying in the industry, and then they told Nordstrom, these are the rates you should charge. So Nordstrom, to that extent, discharged that part of its review process. But they also told shareholders that these payments exceeded the estimated cost to Nordstrom of providing these services. And there is no analysis in the Argus report of the costs to Nordstrom. And you will see in the papers submitted by the defendants, they say that, well, the costs are inbuilt into the rates charged by Argus. There must have been a profit margin. We never alleged that there was a profit margin. The Argus report doesn't say that there's a profit margin. And most importantly, the costs of these third-party providers, they can't be analogized to the costs of Nordstrom. Nordstrom is a fashion retail company. And we're here to determine whether they relied in good faith, not whether the report may or may not have been incorrect in some fashion. But did the board relied on it in good faith? In other words, they didn't know it was wrong, and they did it anyway. Yes, and, Your Honor, that's what we're saying. Because Argus, its review was simply a review of what rates to charge the Nordstrom family. But the board was supposed to do something else. The governance committee said in its proxy statement, this is what it told shareholders. We're not creating the duty. They told shareholders that these charges. But there's a presumption. Isn't there a presumption in the case law? And you're supposed to set out particularized facts or allegations as to why they didn't follow this good faith presumption and fiduciary responsibility? Well, Your Honor, I don't think we're required to plead why. At the pleading stage, all we're required to plead are sufficient facts to rebut the justifiable reliance defense. Where are those facts? And the facts were, as I've just described, Your Honors, the fact that these directors told shareholders that they performed these various reviews, net benefit analysis, fair and reasonable analysis, that these transactions were, that the charges received from the Nordstrom family exceeded the estimated cost to Nordstrom of providing these services. And the Argus report did none of those. And so the board knows that or is telling shareholders we're performing these duties and they obtained an Argus report that doesn't even touch on those specific duties but touches on only one part, which is. Counsel, with respect, you're conflating the Argus matter with the other duties that the board members had. They didn't rely on Argus, did they, for whether or not they completed their duty of loyalty and so on. They looked to them to determine whether the amount of money that was paid by the Nordstrom family was adequate to reimburse the corporation. Isn't that correct? That's right, Your Honor. But that's really what we're talking about here in terms of Argus. If there was a good faith belief that this was a reliable company, they had that. They're not required, are they, to go out themselves and hire somebody else to investigate Argus to determine whether it was accurate? No, we're not saying that, Your Honor. And if I'm not clear, that's not what we're saying. We're simply saying that Argus did only one part of the analysis, one part. Agreed. But that part, that part was okay, was it not? In other words, they were entitled to rely on Argus for what they said was the reasonable cost that the Nordstrom family members should reimburse, right? Not the costs, Your Honor. They were entitled to rely on the Argus report in terms of what to see what other people were charging. But what other people were charging in the industry is not necessarily what – does not necessarily cover Nordstrom's costs. But isn't this the very standard that's used by virtually every major corporation in the country to have someone like Argus make a determination of what the cost should be based on a survey and they reimburse accordingly? I mean, otherwise, you've got to have 200 accountants following people around and checking everything and making an exact calculation. Well, Your Honor, I think it comes from what Nordstrom was telling its shareholders. And as I go back to what it said in the proxy statement, every year they said the same thing, that the payments that we charge the Nordstrom family have two qualities. One, they were based on surveys of the industry. And that was correct, right? That part was correct. That's correct. We don't challenge that part. But the part we challenge is that they then said also that these charges exceeded the estimated cost. And Argus never surveyed that. Remember, Argus is surveying the rates charged by the industry players. But that's a determination made by the members of the board, not by Argus. That second part, right? Yes, it's a determination made by – Let's get to the second part. What is it you're saying? How did the board members, taking the Argus calculation as a correct calculation, then what the board members did was wrong according to you, right? Right, because they told shareholders they were performing these additional analyses, review of net benefit, review to make sure that the charges to the Nordstrom family exceeded the estimated cost, and they didn't do those things. So if Argus only limited its report to one aspect of what the board was supposed to do, then you have a situation here where the board every year is telling shareholders we're doing all these reviews, and they're only performing one of those reviews. If they were negligent in not carrying out those additional duties, does that make them interested? I beg your pardon? Does that make them interested, if they were simply negligent in not doing certain jobs? Yes, Your Honor, because we are saying here that there's conscious disregard of responsibility, which amounts to a breach of the duty of loyalty. Well, conscious disregard is not negligent. I understand. And in addition, we are saying that at the very least, they breached the duty of care because they were supposed to make themselves acquainted with all the relevant material information. But, counsel, with respect, under Brehm v. Eisner, which, as you know, is a Delaware case that Washington tends to rely on in this area, doesn't that require a standard of gross negligence on the part of these directors?  What are you alleging that the non-interested members of the board did that was grossly negligent? In Brehm v. Eisner, Your Honor, the court said there's gross negligence if the directors are presented with information that is material. It's readily available, and they don't even consider that material readily available information, and they're recklessly indifferent to that information. And you'll remember in Brehm v. Eisner, Your Honors, the Supreme Court sent the case back to the Delaware Chancery Court because the Delaware Chancery Court did exactly what the district court did here, which is basically just ruled on the justifiable reliance defense. And the Supreme Court said, well, no, the correct approach is did the plaintiff allege sufficient facts to rebut the justifiable reliance defense? What specifically did you allege that contended that these non-interested directors were grossly negligent in carrying out their duties? First, Your Honors, they told shareholders the specific duties, and I won't go over them again, that the net benefit, fair and reasonable, that they took into account all relevant factors, and that most specifically, that with respect to these transactions, that the charges exceeded the cost. That's part of it, and then they didn't do it. But again, where does Argus come into this? My understanding from reading the pleadings, yours and theirs, and the record, is that they, like many other boards of directors, rely on outside experts to make these determinations. They saw what the Argus report said. They said, okay, this is what they say is reasonable. The Nordstrom family is going to pay more than that. So they did pay more than that. From their perspective, why would that be grossly negligent? Because Argus never examined Nordstrom's costs, and this is important, Your Honors. Well, you're blaming the experts then. You're saying that Argus was at fault, or you're saying that the directors were at fault for not examining the way Argus performed its duties. The directors were at fault for not requiring Argus to perform the additional review. Let me ask you, should the Rails test have been applied here instead of the second prong of Aronson? I know the defendants have argued that the Rails test applies. Our arguments really focus on the first part of the Aronson test anyway, so that first part of the test is equivalent to the Rails test, so it really makes no difference. The only difference in applying the Rails test here would be that perhaps the second prong of Aronson doesn't apply, because the first prong of Aronson really is the Rails test. So the outcome would not be different? It wouldn't be different, Your Honors. Okay. Now, there were 14 directors. Four were family members and were excluded. Four participated in the governance committee. Correct. So that's eight, and the other six did not participate. Do we treat those other six the same as the four governance committee members? Well, actually, there are 13 directors on the board, and there were three interested directors, and four were on the governance committee, so seven of the 13. But to answer Your Honors' question, we don't treat them any differently in terms – because we also allege that the entire board issued misleading proxy statements year after year telling shareholders – But do you have to identify which of the board members did what or the background or their relationship to the families, et cetera? Or can you just lump them all together and deal with the board? We are saying that the other directors are interested because they also face a substantial likelihood of liability for allowing proxy statements every year to be signed off by them. So the exculpatory – you're going to the exculpatory clause situation? Yeah, the exculpatory clause clearly does not apply, Your Honors. This is a well-established what the contours of that clause are. Now, did you waive that below? Did you argue a exculpatory clause below? The defendants argued the exculpatory clause, and we contended that it didn't apply because it doesn't apply to duty of loyalty claims, and it only applies to duty of care claims, but only to the extent you're seeking monetary damages. And here we alleged – we sought injunctive relief. Well, how does injunctive relief impose liability on the individual members? In other words, how are they affected by the injunctive relief? Well, they – it's casting an aspersion on them for breaching their duties that these injunctions have resulted because they failed to do their job. So sort of a reputational damage? It's more than reputational, Your Honors. And look, we remember the fact that after the court below dismissed our action, after the court below dismissed our action, one month after the court dismissed our action, Nordstrom terminated all these transactions. You will never find that in any of the appeal papers, and it would have gone unmentioned unless I mentioned it today. But they terminated all the transactions. And is that relevant? It's relevant because it casts – it shows that these transactions were not proper, as the defendants allege. And secondly, the board never obtained any callbacks from the Nordstrom family when they terminated these transactions. So this has been effectively buried, and we're the only lawsuit that stands because of the statute of limitations. It's been two years now since the dismissal. We're the only lawsuit that stands between shareholders being able to investigate and recover for this damage and the conduct of the board. Counsel, you've exhausted your time. Let me ask my colleagues, do either of you have additional questions?  Thank you very much, Your Honor. Thank you. We'll hear from the respondent. Good morning, Your Honors. Robert Varian for Nordstrom. I will, with the Court's permission, take about 13 minutes of the allotted 15, and Mr. Green will argue for two. Okay. The Court has, I think, cut pretty quickly to the core of the issues, and I'm happy to respond to questions. Before I do that, or obviously I'll respond to questions any time the Court has them, but before I do that, I think a little context might be helpful. This really is a paradigm case in which demand should be required. We've got a board here who had no interest whatsoever in the transactions, financial or otherwise. They didn't even take personal flights on the planes, which actually is pretty common in corporate aircraft, and Nordstrom didn't allow that. The benefits to the corporation, I think, are pretty clear. And the governance committee in particular, but the board as a whole, is composed of very independent, accomplished individuals. They're CEOs. They're not people who are beholden to anybody. They have no interest, and there's no reason to believe that they would do anything other than what they believe to be in the best interests of the corporation. And we believe the record shows very clearly that's exactly what they did. Counsel, with respect to the committee that was in charge, just the governance committee, who were the non-interested directors, and what was their background? Did any of them have an accounting background? I can't answer that question authoritatively. I'm not sure whether there were financial experts. I would assume, given what we do know about them, they're two ex-CEOs, I believe. Of what kind of companies? Publicly traded companies? I can find that exactly, but yes, publicly traded companies, at least in a couple instances. So this is something presumably they would be familiar with. Yes. That's right. And as to counsel's last point, Nordstrom acted in a very responsible way. There was a books and records request. We produced over 2,000 documents to them. They sifted through all of that. They constructed an alternative sort of their theory of the world, peripheral cost analysis, which they're entitled to do. But the idea that somehow Nordstrom's acted in some irresponsible way or has stiff-armed them is simply not correct, and the record is quite clear on that. Mr. Taz, arguing basically that the Governance Committee did not take all the factors into account that it should have, I guess aside from the expert report, can you explain to me what factors the committee did take into account? Yes. Yes, Your Honor. The Argus report is certainly the core of it, and the complaint has not pled any particularized facts to show that the Governance Committee did not take into account, and of course that's their burden to show through particularized facts, did not take into account net benefit to the company, whether it was fair, the transactions were fair to the corporation. And I think the fact of reliance on the Argus report shows clearly that they did take those things into account. But it's not our burden to show that they did. It's their burden to show on a director-by-director basis, Your Honor, that people did not. It references the proxy statements, that there was some indication in the proxy statements. Yes. So the proxy statements are part of the record, and I'd make two core points, either of which is dispositive all by itself. First, as a matter of law, under Citigroup, Lenoir, that's the case that we supplied late because it was decided late. Brehm v. Eisner addresses this and a number of other cases, but Citigroup's probably the best. Aspirational statements about process, in other words, committee charters, what committees are supposed to do, how they normally approach problems or issues, do not establish legal standards. Now, they haven't pled any facts at all, much less particularized facts, to suggest that people didn't do exactly those things, that they failed to consider, whether there was a net benefit or anything else that's referred to in the proxies in an aspirational sense. But let's look at the proxies for a second. The proxies are very clear with respect to these particular transactions exactly what happened. I mean, it's the most fulsome disclosure. I don't want to overstate it, but it's very fulsome. I really couldn't think of anything else they could have added, candidly, when I looked. All the transactions, all the individuals, all the dollars, all the categories, so it's very clear exactly what was done, exactly what was charged. And, you know, the SEC never raised an issue with it. The auditors never raised an issue with it. Nobody's raised an issue with it, ever. Are you saying, counsel, that if we look at the proxy statement, that we will there see everything that the Governance Committee did and which fulfills its obligations under the law? Is that correct? I'm not saying that, Your Honor. Let me try to be a little bit clearer. I think we know, first of all, it's not our burden to show what the proxies, what the committee did. We know that the proxy statement had this fulsome statement about what they did do. Yes. So maybe I misunderstood Your Honor's question. So if you look at the proxies, there are tables, and it's very clear what was charged, how many pilot hours, how many maintenance hours, how much for hanger rent, those kinds of things. Can I ask you this? As a court, if we look at the proxy statement and we look at the various standards that the Governance Committee must fulfill, can we tell by looking at the proxy statement that it fulfilled its duties under the law? I would say yes. I would say it's their burden to show through particularized facts first that the Governance Committee did not do that. And even if they did that, Your Honor, and they didn't, they didn't even come close, they're just quibbling about the process. You can always criticize the process in hindsight. And these are very capable lawyers who follow a lot of these cases, and they know how to criticize aircraft policy processes. So that's what they do. But even if the Governance Committee had gotten it pretty far wrong, and they didn't, I mean, they absolutely didn't, they did everything that a responsible committee would do in this circumstance, that still wouldn't make any of those directors interested. They still wouldn't face any substantial likelihood of liability. And because of the gross negligence standard that we've talked about under the Eisner case? It's even a little stronger than that, Your Honor. The Brehm case, and I don't want to read quotes to the Court, but it's pretty clear that even gross. That's Eisner, isn't it? Brehm versus Eisner. Yes, it is. But even in the situation where there is gross negligence, that's still not enough unless there's some sort of other reason why directors who have no interest in the transaction otherwise acted the way they did. So if it's illegal, if they have some benefit that they're going to get out of it, even gross negligence alone wouldn't be enough. But there's no gross negligence here. There's not even colorable gross negligence here. So we think first that the Governance Committee did exactly what it should have done very responsibly, disclosed what it did in great detail. The proxies don't impose any duties themselves as a matter of law. They describe processes, and that's all they do. And the law is very clear, that's not the legal standard that's imposed in this setting when we're all here arguing about legal claims. But certainly they did exactly what they should have done. Let me ask you this, Counsel. My colleague mentioned that you suggested that the Rails test should have been applied rather than the second prong of Aronson. Does it make any difference in this case? You know, our conclusion, Your Honor, is it makes no difference. And I won't get into the analysis. It gets quite convoluted and a little bit unclear. But the bottom line is it doesn't make any difference. And the argument that the Rails test applies is that the committee, which is less than a majority of the Board, made the decisions to approve the related party transactions. So when you look at the Board as a whole, you would apply the Rails test. But under the Rails test, it's the same basic analysis. They can be interested if they face a substantial likelihood of liability, which is a very high bar. You have to plead it through particularized facts. And you have to overcome the statute, the affirmative presumptions of the business judgment rule, and the exculpatory provision in Nordstrom's charter, all three of those. Is there a difference on the amount of reasonable doubt that it's cast on the judgment of the Board based on the Rails test? Under the Rails test. Versus the Aronson test. It seems like you all are the ones who mentioned it in your briefs. I'm trying to figure out what we do with that. Because if the district court did apply the wrong standard, then did it abuse its discretion? And do we have to send it back? No. And let me try to be clear. It's a very convoluted and interesting legal question. I think probably if we did a little more research, we'd find a law review article that would illuminate this further. It makes no difference in this case. And in terms of the standard on appeal, of course, this court can affirm on any basis that, you know, appears on the record, in the record, and in the law. And this determination, the dismissal, can be affirmed on five or six individual grounds independently that are amply demonstrated in the record. I was just kind of curious because the appellants didn't raise it. You all raised it and then kind of made a big deal about it and then said no, but it's not a big deal. Your Honor, maybe I should apologize for that. I read our briefs and I thought this is a very interesting argument that people have made very effectively. At the end of the day, our conclusion is it doesn't make any difference. And the district court certainly didn't commit error in applying the second prong of the Aronson test. It comes out the same way. So why would there be two tests if it comes out the same way? I'm sorry, Your Honor. I mean, why would there be two different tests if you just simply dismiss them and said they come out the same way? Well, I mean, it seems to me that the difference is that under the Aronson test, you are dealing with the entire board. Under the Rails test, you've got to take into account maybe what happened here, which is that the governance committee thoroughly, maybe relying on Argus, disposed of the matter. But what do we do with the entire board? What's the record show of whether or not they actually, in fact, consider even the Argus test? You know, the problem stems from the fact that the complaint, and I don't mean to cast blame, but you read the complaint, the count one, which is the count that deals with the approval of the related party transaction, speaks of the board as a whole. It names the whole board. So they kind of go back and forth. They haven't been precise about it. And I think out of an abundance of caution, we sort of covered it both ways. But under the second prong of the Aronson test, the analysis really turns out to be the same as the Rails test. And the reason is you look at whether the board could have considered and exercised its business judgment. And in doing that, you look at the same things. You look at whether they faced a substantial likelihood of liability is really the key question in this case. And the business judgment rule protections still apply, just as they do on the second prong of Aronson. The exculpatory clause still applies, just as it does under the second prong of Aronson, as does the reliance on the statute, which is presumed to be in good faith. And someone needs to rebut through particularized facts that presumption, which, of course, was not done here. So I think really almost any way you look at it, this judgment needs to be affirmed. Rails, Aronson, first prong, second prong, abuse of discretion, no abuse of discretion. It really comes out exactly the same way. What's your weakest position? Where are you most susceptible to a problem in the complaint? Well, as Your Honor might imagine, we thought about that. We did. I just didn't sit in your ideas. Yeah. So I would say candidly that the thing that strikes me as the fact that makes me most uncomfortable is that the plaintiff, these very capable lawyers, took all of the books and records information that we gave them, constructed an alternative cost analysis of overhead and attributions and allocations and things. And when they did that and put it side by side with the hours that were charged for maintenance and pilot and other things, they can make it appear that there's some sort of a mismatch. But, you know, first, in the real world, that isn't true. There was a profit margin that covered overhead on every hour that was charged. So for each one of those hours, the corporation received money that covered costs, overhead, and profits. So it's actually subsidizing the flight department. But I think the key point at the end of the day is that even if they got that wrong, even if the analysis that they did in relying on Argus the way they did somehow is flawed, that really doesn't change anything. There's still no particularized facts that get you to a breach of the duty of loyalty or even close. These are directors who have no interest in these transactions. They're trying to do the right thing. They did the right thing, obviously. And there are no particularized facts to rebut the presumption of the business judgment rule  or to rebut the presumption of good faith reliance on an expert in the statute. Now, your time is well gone, and I'm sure your colleague over there is just really unhappy that you're still up there. Thank you. So I'll tell you what we're going to do. We're going to give an extra minute. So you'll have a minute 33, and we'll give him a minute of rebuttal, which he doesn't otherwise have. So let's hear from your joint counsel. Good morning, Your Honors. May it please the Court. My name is Doug Green. I represent Blake, Pete, and Eric Nordstrom and the various entities we call the related party defendants. And I want to make just briefly one set of points. The plaintiff argues that should this court reverse the district court, that she will have established that our motions to dismiss, our 12b-6 motions, were defeated because the 23.1 standard is harder than the 12b-6 standard. And that's just not so, and I want to briefly explain why. Aronson's first prong says that a director is disqualified if he or she has an interest such as a familial or economic interest or faces a substantial likelihood of liability. Here the district court held that it was the familial relationship of Blake, Peter, and Eric that disqualified them from considering demand, and that's clearly stated at ER-21-22. The court did not hold that they face a substantial likelihood of liability. The related party entities, of course, were not on the board, and the court didn't even undertake an interest analysis with respect to them. Of course, we don't believe that whatever the district court did or didn't do, that the plaintiffs have stated a claim here. From our client's perspective, the board set up an independent review through the independent directors on the governance committee. Those directors employed Argus, who you've talked about at great length this morning. Now, Bill, I regret to tell you, as they said in the Middle Ages, tempus fugit, and yours has flown. So we thank you very much for your argument, and we'll hear one more minute for a rebuttal. All right, thank you. Thank you. Your Honors, thank you. I'm going to keep this very, very brief. Your Honors, I just want to make sure that we emphasize this, that the justifiable reliance defense under the Washington Business Corporation Act has two parts. It says that you can only rely on experts as to matters the director reasonably believes are within the person's professional or expert competence. That's the first part. And the second part, a director is not acting in good faith if the director has knowledge concerning the matter in question that makes reliance otherwise permitted by this subsection unwarranted. And here, if you are the directors, and you tell your shareholders every year that, oh, we've got related party transactions in Nordstrom Family, but they've been cleared, and we've performed these reviews, and you don't perform all the reviews. You rely at most on August to figure out what to charge them, but then you don't do this. This is what they tell shareholders. The payments exceeded the estimated cost to the company of providing those services and were based on a survey conducted by a leading independent expert. Two parts. They're based on a survey, and they exceed the estimated cost. Why did they not estimate the cost to the company? They could have just rung up the accounting department. Why get third-party surveys? Thank you, counsel. Thank you very much, Your Honor. Appreciate your arguments. Appreciate argument by all counsel. The case just argued is submitted.
judges: M. Smith, Murguia, Robreno